153 Pa. Commonwealth Ct. 338 (1993)
621 A.2d 1078
EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES and Allied Dunbar Property, Inc., Appellants,
v.
M. Christine MURPHY, Revenue Commissioner and City of Philadelphia, Appellees.
Commonwealth Court of Pennsylvania.
Argued June 18, 1992.
Decided February 5, 1993.
*343 Michael P. Weinstein, for appellants.
John D. Christmas, Asst. City Sol., for appellees.
Before CRAIG, President Judge, and DOYLE, (P.) and FRIEDMAN, JJ.
FRIEDMAN, Judge.
The Equitable Life Assurance Society of the United States and Allied Dunbar Property, Inc., (collectively, Appellants) appeal from an order of the Court of Common Pleas of Philadelphia County denying their motion for summary judgment, granting a cross-motion for summary judgment to the City of Philadelphia (City) and its Revenue Commissioner (collectively, Appellees), and entering judgment against Appellants for payment of delinquent realty transfer taxes. We affirm.[1]
The parties agree on all pertinent facts in this case and filed a stipulation of those facts with the trial court, (R.R. at 68a-73a), a condensed version of which follows.
The entities involved in this case present us with an intricately intertwined cast of characters which includes: Appellant, the Equitable Life Assurance Society of the United States (Equitable), a New York mutual life insurance company; Appellant, Allied Dunbar Property, Inc. (Allied), a Delaware corporation and wholly owned subsidiary of British *344 corporation, Allied Dunbar Assurance, Plc.; Allied Dunbar Property (Eight Penn) Inc., a Delaware corporation, which until February 14, 1986, was a wholly owned subsidiary of Allied; Remm Incorporated (Remm), a wholly owned subsidiary of Equitable and a Pennsylvania corporation; and Penn Eight Associates (Associates), a Pennsylvania general partnership comprised of Equitable and Eight Penn, each of which held a 50% interest in Associates. Associates' only tangible asset was the real estate and building located at 8 Penn Center in Philadelphia. From May 21, 1984 until February 14, 1986, Eight Penn's only asset was its partnership interest in Associates.
On February 14, 1986, Equitable and its subsidiary, Remm, entered into an agreement of sale to purchase all of Eight Penn's one hundred (100) shares of outstanding stock from Allied for $20,737,500.00, ninety-nine (99) shares to Equitable and one (1) share to Remm. The closing for the sale took place simultaneously in New York City and London, with the Eight Penn shares delivered to the buyers in New York City.[2]
In June 1985, the City of Philadelphia amended its Realty Transfer Tax Ordinance, Philadelphia Code §§ 19-140019-1408, *345 by adopting the Ordinance of June 5, 1985, Bill No. 567 (Bill No. 567).[3] The amended tax ordinance required persons selling or accepting securities or shares of any real estate corporation, which in effect transferred ownership of real *346 estate situate within the City, to file certificates of transfer within thirty (30) days of the transaction and pay realty transfer taxes at the rate of two and five-tenths percent (2.5%) of the real estate's value. Philadelphia Code §§ 19-1403 and 19-1404(2).[4]
The parties agree that at the time of the sale, Eight Penn was a "real estate corporation" as more than ninety percent of its assets consisted of real estate. Philadelphia Code § 19-1402(5). Therefore, pursuant to Philadelphia's amended Real Estate Transfer Tax, Equitable's acquisition of Eight Penn stock from Allied required Appellants to file a certificate of transfer and to pay the appropriate realty transfer taxes. Remm was exempted from this requirement because its transfer amounted to only 1% of the transaction. Philadelphia Code 419-1403. Appellants did not, and still have not filed a certificate of transfer or paid any taxes.
Instead, Appellants filed a Complaint in Equity with the trial court, seeking a declaratory judgment that certain former sections of the Philadelphia Realty Transfer Tax Ordinance, as amended by Bill No. 567, are invalid and unconstitutional either as written or as applied to Appellants' transaction. The parties stipulated that Appellants' action was the proper vehicle for resolving these issues and agreed that Appellants should bring these challenges before the trial court by means of a motion for summary judgment.
The trial court denied Appellants' motion for summary judgment, holding that the Philadelphia Realty Transfer Tax Ordinance, as amended by Bill No. 567, was a valid extension of the law, and that Appellants failed to demonstrate that its application to them violated either the Pennsylvania or United States Constitutions. Consequently, the trial court granted *347 summary judgment in Appellees' favor and ordered Appellants to pay the delinquent tax due in the amount of $408,375.00 plus interest from March 16, 1986; i.e., thirty days after the realty transfer occurred.
On appeal,[5] Appellants maintain that: (1) under the Sterling Act,[6] the City of Philadelphia is not authorized to impose its realty transfer tax on the transaction in question; (2) provisions of Bill No. 567 are constitutionally infirm, violating the uniformity clause of the Pennsylvania Constitution and/or the equal protection, due process or commerce clauses of the United States Constitution; and (3) under the Regulatory Preemption Doctrine, Equitable, as a state regulated insurance carrier, is exempt from the Philadelphia Realty Transfer Tax. We will address each of Appellants' arguments in turn.

I. THE STERLING ACT
Appellants contend that Philadelphia can tax transfers of real property, or interests in corporations or partnerships owning real property, only insofar as that power is granted by the General Assembly under the Sterling Act, the City's principal tax enabling act. Section 1 of the Sterling Act, 53 P.S. § 15971, provides Philadelphia with:
the authority by ordinance, for general revenue purposes, to levy, assess and collect, or provide for the levying, assessment and collection of, such taxes on persons, transactions, occupations, privileges, subjects and personal property, within the limits of such city of the first class, as it shall determine, except that such council shall not have authority to levy, assess and collect, or provide for the levying, assessment and collection of, any tax on a privilege, transaction, subject or occupation, or on personal property, which is *348 now or may hereafter become subject to a State tax or license fee.
Pursuant to its authority under the Sterling Act, the City of Philadelphia enacted the Ordinance of September 7, 1937, establishing its first tax on the transfer of Philadelphia real estate. In 1951, the Commonwealth of Pennsylvania adopted the Act of December 27, 1951, P.L. 1742, as amended, 72 P.S. §§ 3283-3292 (P.L.1742), which imposed its own realty transfer tax on the making or presentation for recording of any "deed, instrument or writing whereby any lands, tenements, or hereditaments within this Commonwealth or any interest therein shall be quitclaimed, granted, bargained, sold or otherwise conveyed to the grantee, purchaser, or any other person." 72 P.S. § 3284.
With language reflecting the Commonwealth's intent to preempt the field, the Sterling Act precluded Philadelphia from imposing tax on any matter subject to State tax. Therefore, P.L. 1742 ordinarily would have terminated Philadelphia's right to tax realty transfers entirely. However, P.L. 1742 contained a savings clause which provided:
Notwithstanding anything contained in any law to the contrary, the validity of any law or any ordinance or part of law or of any ordinance, or any resolution or part of any resolution, and any amendments or supplements thereto, now or hereafter enacted or adopted by the Commonwealth or any political subdivision thereof, providing of or relating to the imposition, levy or collection of any tax, shall not be affected or impaired by anything contained in this act.
Section 11 of P.L. 1742, 72 P.S. § 3292.
In 1952, under authority from the saving clause of P.L. 1742, the City replaced the 1937 ordinance with its present realty transfer tax system. Like its Commonwealth counterpart, Philadelphia's 1952 ordinance imposed a realty transfer tax on any "deed, instrument or writing whereby any lands, tenements or hereditaments within this City, or any interest therein, shall be granted, bargained, sold or otherwise conveyed to the grantee, purchaser, or any other person." Ordinance *349 of December 9, 1952, as amended, Philadelphia Code §§ 19-140019-1408.
Appellants first argue that because the Sterling Act only authorizes Philadelphia to assess and collect taxes on transactions or privileges within City limits, the City has no statutory authority to tax Allied's transfer of Eight Penn stock to Equitable, which took place outside Philadelphia's boundaries. City Stores Co. v. Philadelphia, 376 Pa. 482, 103 A.2d 664 (1954). Moreover, even though the property affected by this transfer was situated in the City, Appellants contend that the tax could not be imposed on the privilege of transferring City real estate where that privilege was exercised outside the City. Philadelphia Appeal, 383 Pa. 428, 119 A.2d 205 (1956).
In both City Stores and Philadelphia Appeal, our supreme court held that Philadelphia could not tax transfers of City real estate when the settlement of the real estate sale was held outside the City. Nevertheless, these cases do not strengthen Appellants' position because both cases were decided prior to the effective date of a 1954 amendment to Philadelphia's real estate transfer tax. In City Stores, decided under the 1937 ordinance, the court stated that the ordinance imposed the tax not on the real estate itself nor on the paper on which the agreement for sale was written, but on a "transaction" pertaining to real estate. Because the only "transaction" referred to in the ordinance was the making, execution, issuance and delivery of an instrument of title, all of which took place outside the City, the court held that the transaction fell outside the scope of the ordinance and the City could not collect the tax.
In Philadelphia Appeal, decided under Philadelphia's 1952 Realty Transfer Tax Ordinance, the court concluded that the 1952 ordinance failed to close the loophole which existed in the 1937 ordinance; again, every possible taxable event connected to the transaction was performed outside the taxing district. In addition, the court determined that the City could not alter this outcome by construing the tax as being on the "privilege" of transferring City property rather than on the transaction. The court reasoned that the privilege of owning and transferring *350 property could be taxed only to the extent that the exercise of the privilege occurred within the City.
In 1954, Philadelphia's City Council amended the 1952 ordinance in another attempt to cure the defect in the 1937 and 1952 ordinances. The Council redefined and expanded the term "deliver" to include the presentation for recording within Philadelphia, any document whereby title to or interest in real property located within the City was transferred or conveyed, regardless of where the document actually was executed, delivered or accepted, thereby bringing recordation of the deed within the scope of the taxing provision.
After this amendment became effective, our supreme court decided L.J.W. Realty Corp. v. Philadelphia, 390 Pa. 197, 134 A.2d 878 (1957),[7] in which appellants had acquired Philadelphia real estate by deeds executed and accepted outside the Commonwealth, but presented for recording in Philadelphia. The court in L.J.W. determined that the 1954 amendment to the ordinance broadened the ordinance's scope, and held that the City did not contravene the Sterling Act by imposing its realty transfer tax upon the physical presentation of a deed for recording within Philadelphia, even though the delivery of the deed signifying conveyance of the real estate occurred outside the City.
Based on L.J.W., Appellees here assert that the Sterling Act grants the City authority to assess and collect its realty transfer tax by requiring parties who transfer ownership interest in Philadelphia real estate to record that transaction by filing a certificate of transfer with the City, and to pay tax on the filing of that certificate regardless of where the documents of transfer were executed. Appellees contend that this is true whether the transfer involves legal title to real estate, or the equitable interest therein, such as the transfer of stock of an acquired real estate company which owns the real estate in question. Philadelphia Code § 19-1401. The City asserts *351 that it is not attempting to tax a transaction occurring beyond City boundaries, but is taxing the presentation of the certificate of transfer in the City, as permitted under L.J.W. Appellees claim the right to require the filing of the certificate because of Appellants' substantial nexus with the City, supplied by ownership of City property and the services and benefits which Appellants receive from the City in connection with that property.[8]
Appellants counter, arguing that when the City compels transferring parties to file a certificate of transfer in Philadelphia, even if the actual transfer occurred elsewhere, so that the City is empowered to tax the parties under L.J.W., it attempts to accomplish indirectly that which the Sterling Act prohibits the City from doing directly. Appellants thus argue that this recording requirement is invalid, particularly here, where the parties involved are not City residents and the transfer is not of real estate, which requires that a deed be filed, but of corporate stock or partnership interests. We decline to accept Appellants' argument and choose instead to recognize the reality of the situation here; to do otherwise would constitute a holding that form controls over substance.
Appellants emphasize that Philadelphia can impose its realty transfer tax only on transfers of land, tenements and herediments within the City; however, Appellants fail to acknowledge that the ordinance also calls for the tax to be imposed on "any interests therein." By enacting Bill No. 567, the City sought to tax real estate transfers that previously went untaxed because they were accomplished through the *352 creation of corporate entities, whose stock could be transferred in lieu of deeds to realty. The trial court stated that "[b]y requiring that a transaction which shifts ownership from one entity to another via a subsidiary without the execution of a conventional deed to be recorded as a certificate of transfer, just as a deed would be recorded is within the statutory authority of the city to tax transfers of `interests' in real property. . . ." (Trial Court Opinion at 8.)
We agree that there should be no distinction made between equitable and legal transfers of real property. Because real property is immobile and so may not be physically transferred, its ownership can be conveyed only symbolically. We can discern no reason for distinguishing between a direct conveyance by deed and an indirect transfer through the sale of corporate stock where either method evidences an identical transfer of ownership interest in the real property. If the execution or presentation of a deed within the taxable jurisdiction has been upheld as a valid taxable event, L.J.W., then the recording of an equitable transfer of real property within that jurisdiction should also be taxable.
Second, Appellants contend that their transaction was a transfer of stock, which is personalty, and therefore not subject to the realty transfer tax. Appellants argue that a transfer of corporate securities does not constitute a transfer of ownership of the realty or other property owned by the corporation. Monongahela Bridge Co. v. Pittsburgh & Birmingham Traction Co., 196 Pa. 25, 46 A. 99 (1900); Ashley v. Ashley, 482 Pa. 228, 393 A.2d 637 (1978).[9] As such, Appellants contend that their transaction was a transfer of personal property, not intended to be included within the scope of realty transfer taxation in Pennsylvania. Commonwealth v. Haveq Industries, Inc., 411 Pa. 515, 192 A.2d 376 (1963). Appellants assert that the Savings Clause of P.L. 1742, although allowing existing local realty transfer taxes to continue, *353 does not provide the City with statutory authority to tax transfers of personal property, such as the corporate stock or partnership interests that are the subject of Appellants' transaction, under the guise of its realty transfer tax.
Despite Appellants' citations to the contrary, we have previously recognized that transfers of "real estate corporations" constitute transfers of "interests" in property held by those corporations, which are properly taxed by municipalities. Health Group Care Centers, Inc. v. City of Pittsburgh, 122 Pa.Commonwealth Ct. 384, 552 A.2d 323 (1988), appeal denied, 523 Pa. 644, 565 A.2d 1168 (1989). In Health Group, the City of Pittsburgh, like Philadelphia here, amended its city code to specify that stock purchases would be taxed as realty transfers when most of the corporate assets (50% in that case) were in the form of real estate. The appellants in Health Group argued that taxing only those corporations with more than 50% of their assets in the form of real estate violated equal protection. We disagreed, stating that "[Pittsburgh's] classification is substantially related to its purpose of taxing purchases of the stock of corporations which are primarily real estate transfers." Id. 122 Pa.Commonwealth Ct. at 388, 552 A.2d at 326 (emphasis added). Although Health Group was decided under the local tax enabling act (LTEA) rather than the Sterling Act,[10] it is still applicable here for the proposition that some stock transfers must be recognized for the real estate transfers that they actually are. The reality of the situation is even more apparent in this case where the taxpayer's sole asset was the 8 Penn Center property, so that the economic *354 value of the sale derived only from Philadelphia realty.[11]

II. CONSTITUTIONALITY

A. Uniformity and Equal Protection
The constitutional requirement of uniformity in the imposition of taxes appears in Article VIII, § 1 of the Constitution of Pennsylvania, directing that: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Appellants contend that three provisions of Bill No. 567 violate this constitutional provision, known as the uniformity clause, in that Bill No. 567: (1) exempts entities transferring less than 1% of the ownership of real estate corporations from tax liability; (2) computes "taxable value" differently depending on whether parties transfer fee interests in real estate by deed or transfer ownership interests in real estate corporations or partnerships by securities or shares; and (3) defines "real estate corporation" so as to impose an inequitable tax burden on particular entities. In addition, Appellants contend that the tax has been enforced in a discriminatory fashion, violating the equal protection clause of the United States Constitution, U.S. Const.Amend. XIV, § 1.[12]
In Allentown School District Mercantile Tax Case, 370 Pa. 161, 167-68, 87 A.2d 480, 483 (1952),[13] our supreme court provided the guidelines for a uniformity analysis, stating:

*355 [The uniformity clause] means that the classification by the legislative body must be reasonable and the tax must be applied with uniformity upon similar kinds of business or property and with substantial equality of the tax burden to all members of the same class. . . . Uniformity requires substantial equality of tax burden. While taxation is not a matter of exact science and perfect uniformity and absolute equality in taxation can rarely ever be attained, the imposition of taxes which are to a substantial degree unequal in their operation or effect upon similar kinds of business or property, or upon persons in the same classification, is prohibited. Moreover, while reasonable and practical classifications are justifiable, where a formula or method of computing a tax will, in its operation or effect, produce arbitrary or unjust or unreasonably discriminatory results, the constitutional provision relating to uniformity is violated. `A tax to be uniform must operate alike on the classes of things or property subject to it.' (Citations omitted.)

(1) The 1% Exception

First, Appellants allege that by excluding from taxation those transfers which involve 1% or less of the ownership interest in a real estate corporation, Bill No. 567 violates the uniformity clause. Philadelphia Code §§ 19-1403 and 19-1404(2), as amended by Bill No. 567, impose tax on stock transfers of defined "real estate corporations" only when the transfer is for more than 1% of the ownership of the corporation; a transfer of 1% or less is not subject to the tax. Appellants argue that this distinction makes the tax unconstitutional.
As we approach consideration of the tax ordinance's constitutionality, we remain mindful that the validity of taxing authority actions is presumed. Allegheny County v. Monzo, 509 Pa. 26, 500 A.2d 1096 (1985). The selection of the subjects for taxation, their classifications, and the method of collection are legislative matters, Crosson v. Downingtown Area School District, 440 Pa. 468, 270 A.2d 377 (1970); Durach's Appeal, 62 Pa. 491 (1870), and the only constitutional limitation on this *356 power is that the classification be reasonable and not arbitrary. Jones and Laughlin Tax Assessment Case, 405 Pa. 421, 175 A.2d 856 (1961); Sablosky v. Messner, 372 Pa. 47, 92 A.2d 411 (1952). Therefore, the court can declare a statute void only when it violates the Constitution clearly, palpably and plainly. Leonard v. Thornburgh, 507 Pa. 317, 489 A.2d 1349 (1985); American Stores Co. v. Boardman, 336 Pa. 36, 6 A.2d 826 (1939); Heisler v. Colliery Co., 274 Pa. 448, 118 A. 394 (1922); Coe v. Duffield, 185 Pa.Superior Ct. 532, 138 A.2d 303 (1958). The heavy burden of demonstrating that the classification employed is unreasonable rests on the party challenging the constitutionality of the tax. Commonwealth v. Life Assurance Co. of Pennsylvania, 419 Pa. 370, 214 A.2d 209 (1965), appeal dismissed, 384 U.S. 268, 86 S.Ct. 1476, 16 L.Ed.2d 524 (1966).
The validity of the Philadelphia realty transfer tax, as amended by Bill No. 567, thus turns upon the reasonableness of its classification. The question for our determination is whether the City Council properly classified and exempted transactions amounting to less than 1%. Prior case law has determined that classification for the purposes of taxation is appropriate when based on the existence of differences recognized in the business world, on the want of adaptability of the subjects to the same method of taxation, upon the impracticability of applying to them the same methods so as to produce justice and reasonably uniform results, or upon well grounded considerations of public policy. Crosson; Life Assurance. In reviewing those cases in which classifications were deemed valid, we are forced to conclude that those classifications do not resemble the situation presented here.[14]
*357 Appellants rely on two decisions of the Pennsylvania Supreme Court to support their argument. In the first of these cases, Kelley v. Kalodner, 320 Pa. 180, 181 A. 598 (1935), the court invalidated a state income tax. The court found a lack of uniformity in the imposition of graduated tax rates, based on income amount, and in the tax exemption for all persons of the first $1,000.00 or $1,500.00 of income, depending on the marital status of the taxpayer. The court specifically noted that exempting from taxation those persons whose income fell below $1,000.00 or $1,500.00, showed a lack of uniformity, notwithstanding the State's commendable motive to place the tax burden on those most able to pay.
Similarly in Saulsbury v. Bethlehem Steel Co., 413 Pa. 316, 196 A.2d 664 (1964), the court held that a $10.00 per year occupational privilege tax which exempted individuals with an annual income of less than $600.00 transgressed the limits of uniformity, reasoning that a tax imposed on an occupational privilege must apply to all who share the privilege. The court stressed that no part of the class could be excused, regardless of the motive behind the action.
Appellants argue that Bill No. 567 contains exactly the same elements of nonuniformity condemned in Kelley and Saulsbury. We must agree. Despite Appellees' attempts to distinguish the situation here, we believe that the taxing schemes struck down in Kelley and Saulsbury are comparable *358 to the realty transfer tax presently challenged. City Council here creates a classification based solely upon a quantitative difference of precisely the same tax base, in that the classification rests upon the percentage of ownership interest transferred and nothing else. Where different rates are imposed upon varying amounts or quantities of the same tax base, the tax is constitutionally deficient. Turco Paint & Varnish Co. v. Kalodner, 320 Pa. 421, 184 A. 37 (1936). In this case, transfers of interests in real estate corporations which exceed 1% pay tax at a rate of 2.5%, whereas transfers of less than 1% pay no tax at all. A pretended classification, based solely on a difference in quantity of precisely the same kind of property, is necessarily unjust, arbitrary, and illegal. American Stores.
Although recognized criteria for classification are absent here, Appellees nevertheless contend that the 1% exclusion was neither arbitrary nor capricious, but was designed to eliminate those transactions which City Council regarded as de minimis. This justification for differentiating between tax subjects, obviously a quantitative distinction, has already been offered and rejected in Saulsbury.[15]
While we cannot expect perfect uniformity and absolute equality in taxation, imposition of taxes which are to a substantial degree unequal in operation and effect upon similar businesses or property, or upon persons in the same class of subjects is prohibited. Allentown. If, as in Kelley and Saulsbury, a class cannot be constitutionally divided based on amount of earned income, then a realty transfer tax cannot properly be assessed based on the amount of interest in property transferred. The 1% exception does just that, placing unequal tax burdens on entities enjoying an identical privilege; accordingly, we cannot sustain it.
*359 However, our analysis cannot end here. Appellees urge that in the event we hold the provision relating to the 1% exemption unconstitutional, the ordinance should be read as if this provision were not contained in the ordinance, with the result that all transfers of interests in real estate corporations would be taxable. Appellees rely on the Philadelphia Code § 1-106(1), which states:
the provisions of the Code are severable, and if any provision or application is held illegal, such illegality shall not affect the remaining provisions. It is the legislative intent of the Council that the Code which would have been adopted if such illegal provision had not been included and any illegal application had not been made.
This same severability argument was considered and rejected in Saulsbury, where the court offered guidelines with which to approach the severability argument, stating:
It is true that a statute or ordinance may be partially valid and partially invalid, and that if the provisions are distinct and not so interwoven as to be inseparable, that the courts should sustain the valid portions. . . . In determining the severability of a statute or ordinance, the legislative intent is of primary significance. However, the problem is two-fold: The legislating body must have intended that the act or ordinance be separable and the statute or ordinance must be capable of separation in fact. The valid portion of the enactment must be independent and complete within itself. Id., 413 Pa. at 320-21, 196 A.2d at 666-67. (Citations omitted; emphasis in original.)
Thus, the issue is whether offending sections of the ordinance can be excised so that the remainder stands as a coherent whole which still expresses the intent of the City Council.
In Saulsbury, the court found the provision was indivisible and declined to sever it, specifically noting that there were not two separate and distinct provisions in that ordinance, and that nowhere was the tax imposed on all individuals enjoying an occupation within the municipalities. This is not the case here; unlike the tax in Saulsbury, the 1% exemption can be *360 severed without destroying Philadelphia's general legislative scheme regarding taxation of real estate transfers.
Bill No. 567 introduced the following certificate of transfer requirement in Philadelphia Code § 19-1403:
Any person who sells or accepts any security or partnership share of any real estate corporation or partnership which owns, or a subsidiary of which owns directly or indirectly, any real property situate in the City of Philadelphia shall, upon the sale or acceptance of securities or shares which represent more than one percent (1%) of the ownership of the real estate corporation or partnership, execute a certificate of transfer, in a form prescribed by the Department [of Revenue], and present said certificate for recording at the Department of Records within thirty (30) days of its execution. (Underlined words to be deleted.)
With the deletion of six words, § 19-1403 reads:
Any person who sells or accepts any security or partnership share of any real estate corporation or partnership which owns, or a subsidiary of which owns directly or indirectly, any real property situate in the City of Philadelphia shall, upon the sale or acceptance of securities or shares which represent . . . ownership of the real estate corporation or partnership, execute a certificate of transfer, in a form prescribed by the Department, and present said certificate for recording at the Department of Records within thirty (30) days of its execution.[16]
Section 19-1403, with this deletion, does not ignore or subvert the express intent of the City Council to tax realty transfers accomplished indirectly through the transfer of shares of real estate corporations; in fact, removal of this phrase preserves the purpose of the ordinance as a means of taxing all transfers of Philadelphia realty, however effected. In addition, after removal of the invalid portion, the provision remains self-sustaining and capable of separate enforcement. Rutenberg v. Philadelphia, 329 Pa. 26, 196 A. 73 (1938). Therefore, we can conceive of no basis to conclude that the *361 designated words are not properly severable from the ordinance as a whole.
Appellants argue that the ordinance here is no different than the one in Saulsbury, and so is inseparable. Moreover, Appellants argue that by accepting Appellees' severability argument, the court would overstep its authority by designing an alternative tax scheme. Appellants claim that we would be indulging in judicial legislation by substituting a clause making all transfers taxable.
Unlike the situation in Saulsbury, there are two distinct ordinance sections involved here, which act in concert to ensure the imposition of Philadelphia's realty transfer tax. Section 19-1404(2) imposes the tax on every person transferring Philadelphia property, either directly or indirectly; this section requires no alteration.[17] Moreover, we hasten to assure Appellants that we have not inserted any clause into the ordinance, an action clearly outside our judicial function. Heller v. Frankston, 504 Pa. 528, 475 A.2d 1291 (1984). Instead, we have merely deleted a portion of the provision concerning the filing of certificates of transfer, so that the ordinance could pass constitutional muster. Where an ordinance is capable of a construction that will preserve its constitutionality, the court is obligated to apply it. Teal v. Township of Haverford, 134 Pa.Commonwealth Ct. 157, 578 A.2d 80 (1990), appeal denied, 527 Pa. 659, 593 A.2d 429 (1991); County of Lawrence v. Foht, 33 Pa.Commonwealth Ct. 379, 381 A.2d 1348 (1978); Kadash v. City of Williamsport, 19 Pa.Commonwealth Ct. 643, 340 A.2d 617 (1975); Allentown. We do so here.

*362 (2) Taxable "Value"

Second, Appellants contend that Bill No. 567's definition of taxable "value", upon which the realty transfer tax is based, is discriminatory and so violates the Uniformity Clause. Philadelphia Code § 19-1402(4) defines taxable "value" in cases of transfers of interests in real estate corporations or partnerships as the greater of fair market value or assessed market value. However, for purposes of direct transfers of fee interests in real estate by deed, value is defined as actual consideration, or where there is no actual consideration paid, as the greater of fair market or assessed market value. Appellants argue that this distinction is arbitrary and unreasonable, and because application of these definitions may produce in equality of tax treatment between transfers of fee interests by deed and transfers of ownership interests in real estate corporations or partnerships by securities or shares, they transgress uniformity requirements. Allentown.
Appellees counter by claiming that for tax purposes, the City can classify direct real estate transfers differently than transfers of interests in real estate corporations and partnerships because the two transfer methods are distinct in character and in business purpose and effect. As previously discussed, taxing authorities are granted wide latitude in classifying tax subjects. As long as the classification imposed is not capricious or arbitrary, but rests upon some reasonable consideration of difference or policy, equal protection of the law has been afforded. Turco Paint. Because legitimate business and policy reasons justify a differentiation between these two types of transfers, we cannot say that this is an arbitrary or unreasonable classification. See Sablosky. In compliance with uniformity requirements, taxpayers within each of these classifications are treated uniformly; therefore, this provision of Bill No. 567 is constitutionally valid.

(3) Definition of "Real Estate Corporation" or "Partnership"

These same principles can be applied to Appellants' allegation that Bill No. 567 transgresses the uniformity clause *363 with its definition of "real estate corporation" or "partnership". Philadelphia Code § 19-1402(5) defines "real estate corporation" or "partnership" as an entity in which the value of the real estate holdings is 90% or more of the tangible asset holdings of such corporation or partnership. Appellants argue that this definition results in the imposition of unequal and inequitable tax burdens because it exempts entities whose real estate holdings do not reach this threshold, even if they constitute 89.99% of the value of the corporation's tangible assets.
We considered the constitutionality of a similar tax scheme and classification in Health Group with regard to Pittsburgh's Realty Transfer Tax Ordinance. In that case, the appellants argued that taxing only corporations with fifty percent (50%) or more of their assets in the form of real estate was not a rational tax classification. We disagreed, reasoning that this classification served to advance Pittsburgh's aim of taxing purchases of corporate stock that were essentially transfers of real estate. Therefore, in the words of the trial court: "If `over 50%' is a sufficient real estate holding to qualify a corporation as a `real estate corporation,' then surely `over 90%' cannot be found to be any less rational." (Trial Court Opinion at 11.)

(4) Uneven Enforcement

Finally, Appellants allege that Bill No. 567 has given rise to discrimination in the enforcement of the City's realty transfer tax, in violation of the uniformity clause of the Pennsylvania Constitution and the equal protection clause of the United States Constitution. To prevail on a claim that administration of a tax violates its rights to be taxed uniformly with others in its class, a taxpayer must demonstrate "deliberate, purposeful discrimination" in the application of the tax. Fisher Controls Co., Inc. v. Commonwealth, 476 Pa. 119, 381 A.2d 1253 (1977). Here, Appellants fail to meet their burden of proving a discriminatory pattern entitling them to relief.
Appellants note that with respect to transfers of shares or interests in real estate corporations, the City could not identify *364 any other person who filed certificates of transfer pursuant to Bill No. 567, nor could the City name anyone from whom it collected, or attempted to collect, the tax. However unusual this may appear, it does not provide sufficient grounds on which to conclude that the City purposefully and deliberately discriminated against Appellants in the application of the tax. For this, Appellants would need to establish that the City knew of other similar transactions but deliberately failed to require tax payment from the parties involved.
As Appellees point out, because this is a self-assessed tax, the City can discover that the tax is due only when a certificate of transfer is filed. Appellants offer no evidence establishing that the City purposely failed to collect tax from any taxpayer who filed a certificate of transfer. "Just because the [C]ity is not (or was not) actively pursuing such taxpayers (even if it should have been), the [C]ity has not waived its right to collect taxes when presented with an opportunity to do so." (Trial Court Opinion at 12); See also Commonwealth v. Westinghouse Electric Corp., 478 Pa. 164, 386 A.2d 491 (1978) (errors or misinformation of its officers or agents cannot estop government from collecting taxes legally due).

B. Due Process
Appellants also argue that by imposing its realty transfer tax on their transaction, Philadelphia attempts to extend its taxing power beyond its borders in violation of the due process clause of the United States Constitution. U.S. Const. amend. XIV, § 1. This clause protects citizens from unfair tax burdens by limiting the power of states and their political subdivisions to impose extra-territorial taxation. In order to comply with due process requirements, the United States Supreme Court has determined that such taxation be restricted to cases where there exists "some definite link, some minimal connection, between the state and the person, property or transaction it seeks to tax," Miller Brothers Co. v. Maryland, 347 U.S. 340, 344-45, 74 S.Ct. 535, 539, 98 L.Ed. 744 (1954), and has required that the taxes imposed bear a "rational relationship" to the protections, opportunities and *365 benefits given by the taxing authority. Moorman Manufacturing Co. v. Bair, 437 U.S. 267, 273, 98 S.Ct. 2340, 2344, 57 L.Ed.2d 197 (1978). The simple but controlling question is whether the taxing authority has given anything for which it can ask return. Wisconsin v. J.C. Penney, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940).
Appellants contend that there is an insufficient nexus between the City and the transaction it seeks to tax here because the stock transfer, effectuated without any grant of City authority, took place outside Philadelphia between two non-domiciliary corporations and related to stock in a third non-domiciliary corporation that owned no property within the City. Appellants rely on Connecticut General Life Insurance Co. v. Johnson, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 (1938), to support this position; however, we believe their reliance is misplaced. In Connecticut General, the Connecticut General Life Insurance Company (CGLIC), a Connecticut corporation, conducted life insurance business in California under license from that state. In addition to writing policies in California that insured California residents directly, CGLIC also entered into reinsurance contracts with other California insurance companies, reinsuring them against losses on policies they wrote in California and issued to California residents. The reinsurance contracts were entered into in Connecticut, where the premiums were paid and any losses were payable. California attempted to impose a tax on CGLIC with respect to the premiums it received under the reinsurance contracts. However, the United States Supreme Court held that such a tax was unconstitutional because the connection between California and CGLIC's reinsurance contracts was too attenuated where no act in the course of their formation, performance or discharge took place in California, and the performance of those acts was not dependent upon any privilege or authority granted by the state.
The Court's decision in Connecticut General presents no barrier to imposition of Philadelphia's realty transfer tax in the present case because the decision in Connecticut General depended largely upon the nature of reinsurance itself. *366 CGLIC paid tax with respect to other types of insurance business it conducted within California under California's recognized authority to tax the grant of the privilege of doing business there. However, the Court held that because the reinsurance contracts did not run to the original insured and involved no action taken in California, they were not embraced by any privilege granted by that State. In contrast, the Court specifically stated that the writing of policies outside the state insuring residents and risk in California was taxable as within this granted privilege.
Our case is more akin to the latter situation, found taxable by the Court, in that although settlement here took place outside Philadelphia, it effected a transfer of real estate located in the City. The fact that the settlement effecting this transfer transpired outside the City does not destroy the nexus between Philadelphia's realty transfer tax and the transaction within the City for which the tax is an exaction. The reach of the taxing power may be carried beyond borders to reach non-residents and extra-territorial activities when taxable property or transactions are within the jurisdiction of the taxing authority. Miller Brothers. The transfer of property located within the City provides more than the minimal connection due process requires between the taxing authority and the person, property or transaction it seeks to tax.
Moreover, as Appellants' stock acquisition is in reality a transfer of Philadelphia real property, a rational relationship exists between the City and the transaction here. Philadelphia does not attempt to tax transfers of interests in any corporation, but imposes the tax only on transfers of interests in corporations whose Philadelphia real estate interests comprise at least 90% of their assets. (In fact, in this particular case, that figure is 100%.) As stated earlier in this opinion, Philadelphia can require Appellants to file a certificate of transfer under such circumstances. In Connecticut General, the Court held that the California tax was unrelated either in measure or incidence to any act within California, and so violated due process. Here, on the contrary, Appellants' filing of the certificate of transfer in Philadelphia as well as the *367 measure of realty transfer tax imposed are inextricably tied to the transfer of real estate interests located within City boundaries. It is undisputed that Philadelphia may validly tax transfers of City real estate made directly by deed; therefore, the City should also be able to tax transfers of corporate stock which accomplish precisely the same thing without infringing on due process.

C. Commerce Clause
In a related argument, Appellants also contend that because the transaction settlement took place outside the City between non-domiciliary corporations, the City's imposition of its realty transfer tax violates the commerce clause of the United States Constitution. U.S. Const. art. 1, § 8, cl. 3. It is unquestioned that taxes which unfairly burden interstate commerce are invalid. A four point test to determine the validity of a tax challenged as burdensome to interstate commerce was articulated by the United States Supreme Court in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Under this standard, a challenged tax does not offend the commerce clause if it: 1) is applied to an activity with a substantial nexus to the taxing jurisdiction; 2) is fairly apportioned; 3) does not discriminate against interstate commerce; and 4) is fairly related to the services provided by the authority levying the tax.
In urging us to declare the tax unconstitutional, Appellants claim that Philadelphia's imposition of its realty transfer tax on their transaction fails each prong of this test. First, Appellants argue that as an out-of-state transfer, their activity lacks a substantial nexus to the City. Second, Appellants contend that the tax is not fairly apportioned because it carries the possibility of double taxation from another state. Third, Appellants claim that the tax discriminates against interstate commerce by impeding the free free flow of trade between states, and finally, Appellants assert that the transfer was not facilitated by any privileges or services provided by Philadelphia, and so was not fairly related to services provided by the City.
*368 Appellees, however, assert that the realty transfer tax satisfies all four Complete Auto Transit requirements and hence is constitutional. We agree. Applying the first element, requiring a nexus with the taxing jurisdiction, we note again that Philadelphia does not impose the challenged tax on all stock transfers but only on those which are essentially transfers of ownership interests in real property located within City limits. Philadelphia clearly has authority to tax transfers of real estate within its jurisdiction. Therefore, we have no difficulty in determining that the transfer of ownership of a building located within Philadelphia creates a substantial nexus with the City, regardless of how that transfer was effected or where the exchange of papers evidencing that transfer took place.
Next, the tax must be fairly apportioned. That is, the tax cannot be duplicative; rather, it must be structured so that if every state were to enact a similar law there would be no multiple taxation. Additionally, the tax imposed must reasonably reflect the in-state component of the activity being taxed. Container Corp. of America v. Franchise Tax Board, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). Bill No. 567 satisfies both requirements. Because transfer of real estate within the Philadelphia City limits is the subject of the tax, and only Philadelphia can tax sales of real estate within its borders, no other locality could tax this conveyance of City property by stock transfer, even if it enacted a similar ordinance. Further, because the only portion of the transaction which is being taxed is that involving the transfer of City real estate, only the in-state, indeed, the in-city part of the taxed transaction is subject to the tax.
Under the third prong, prohibiting discrimination against interstate commerce, a taxing authority cannot impose a heavier tax burden on non-domiciliaries than on its own residents. American Trucking Associations, Inc. v. Scheiner, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987); H.K. Porter Co. v. Commonwealth, 111 Pa.Commonwealth Ct. 463, 534 A.2d 169 (1987). There is no such discrimination here. Any real estate corporation or partnership, whether domiciled *369 in Pennsylvania or elsewhere, is subject to the same tax to the extent it transfers real property situate within the City. Further, the tax rate imposed on non-domiciliaries is identical to that imposed on parties domiciled in the City.
Finally, to satisfy commerce clause requirements, a tax must be fairly related to services provided by the City because it is the taxpayer's activity or presence within the state which justifies its being made to bear a share of the tax burden. Commonwealth Edison Co. v. Montana, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). Here, the building involved is located in Philadelphia and so it, and its tenants, are serviced by the City fire department, police department, streets department and all other municipal services that property owners receive from the City.[18] Because it is reasonable that the City collect taxes from all those who benefit from the municipal services it provides, such services can be considered part of the tax burden in which a taxpayer must share. D.H. Holmes Co. v. McNamara, 486 U.S. 24, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988). We are satisfied that the tax imposed pursuant to Bill No. 567 comports with each of the four requirements of the Complete Auto Transit test, so that Appellants' commerce clause argument fails.

III. REGULATORY PREEMPTION
Finally, Appellants assert that comprehensive state regulation of the insurance industry, pursuant to the Insurance *370 Department Act,[19] the Insurance Company Law of 1921[20] and relevant portions of the Pennsylvania Tax Reform Code of 1971,[21] manifests the legislature's desire to entirely occupy the insurance field and so preempts the City from imposing its realty transfer tax on Appellants' transfer of Philadelphia real estate. More specifically, Appellants argue that the sections of the Insurance Company Law which deal with real estate investment have been held to mean that the "business of insurance" includes an insurance company's real estate investment activities; therefore, regulation of these activities rightfully should be delegated to the state insurance commissioner. Further, Appellants contend that the City's realty transfer tax, by burdening the maintenance of insurance company reserves, intrusively impinges on the Legislature's regulatory scheme. Appellants liken their situation to that which compelled application of the regulatory preemption doctrine in the banking industry. Pittsburgh v. Allegheny Valley Bank, 488 Pa. 544, 412 A.2d 1366 (1980).
In Allegheny Valley Bank, our supreme court held that the City of Pittsburgh could not impose its business privilege tax on the gross receipts of state and national banks within that city because the legislature's pervasive regulation of the banking industry preempted such local taxation. Noting the "delicate nature" of the banking industry, the court determined that in the judgment of the Legislature, unified state-wide regulation of banks was the best method for protecting the soundness and integrity of banking institutions, and that the challenged local tax on bank revenues manifestly intruded into the Legislature's regulatory schema, designed to advance this purpose. The court in Allegheny Valley Bank stated:
[A]ppellant seeks tax payments, calculated as a percentage of bank revenues, which would impose additional costs on appellees' business operations in the city. Thus, the Business Privilege Tax creates a direct burden upon the banking business of appellees. . . . Were we to permit municipal *371 taxing authorities in the Commonwealth to impose various business taxes upon state banks, such an accumulation of tax plans would surely impair the legislatively mandated supervisory authority of the Banking Department.
Id. at 553, 412 A.2d at 1370.
Analogizing the banking and insurance industries, Appellants urge that just as the legislature's comprehensive regulation of the banking industry preempts local taxation of banks, it was the legislature's judgment that a unified state-wide regulation of the insurance industry was the best means to promote the soundness of that industry and that such regulation does not permit local taxation to intrude upon this state-wide system in the absence of a specific statutory grant. We disagree.
Although inexplicably omitted from Appellants' brief, Appellees' brief and the trial court opinion, we believe that section 342 of the Insurance Company Law, 40 P.S. § 464, applies here and manifests the legislature's intent in this regard. That section provides:
Nothing herein contained shall be deemed to prevent or relieve real estate, acquired, held, mortgaged, leased, or conveyed, by any insurance company, under the provisions of this act, from being taxed in the same manner as other real estate within this Commonwealth is taxed.
The language of this provision clearly expresses the legislature's desire to include insurance companies among those entities who are subject to taxation imposed on transactions involving real estate. Accordingly, the regulatory preemption doctrine does not bar Philadelphia from collecting its realty transfer tax from Appellants.
Moreover, even in the absence of this provision, we nevertheless would hold that state regulation of the insurance industry does not preempt the imposition of Philadelphia's realty transfer tax on Appellants. When laws are silent as to whether municipalities are permitted to impinge in any manner upon the field entered by the state, we must resolve the question by ascertaining the probable intention of the legislature in that regard. Allegheny Valley Bank. We observe *372 that the court in Allegheny Valley Bank, while determining that Pittsburgh's business privilege tax impermissibly impinged on the Commonwealth's taxation of bank revenues, was careful to emphasize that challenged taxes must be considered individually, stating:
Today's decision of course does not exempt state banks from all municipal taxation. The determination whether a tax is preempted must always turn on an examination of the Legislature's intent. It is clear, for example, that municipal taxation of banks' real estate is not preempted by the Legislature. See 72 P.S. § 7701.[22]
Id. at 554 n. 12, 412 A.2d at 1371 n. 12. (Citations omitted); See also Commonwealth v. Wilsbach Distributors, Inc., 513 Pa. 215, 224 n. 14, 519 A.2d 397, 402 n. 14 (1986).
Regarding the effect of regulatory preemption on the form of local taxation presented in this case, we derive considerable guidance from our recent decision in City of Philadelphia v. Tax Review Board (Scott), 144 Pa.Commonwealth Ct. 374, 601 A.2d 875 (1992), appeal denied, 531 Pa. 649, 612 A.2d 986 (1992). In Scott, we determined that securities dealers in Philadelphia were liable for payment of the city's mercantile license tax, holding that state regulations did not preempt the securities industry from local taxation.
In reaching our decision in Scott, we considered the various cases in which local taxes were deemed to be preempted by the state's regulation of a particular industry. Beginning with Allegheny Valley Bank, we observed that the court in that case relied upon the unique historical status of the banking industry and the state's interest in preserving the soundness *373 of that industry. Because of the unique considerations with which the court had to contend in Allegheny Valley Bank, we concluded that its rationale would be difficult to apply in other contexts. Scott.
Next, Scott discussed Liberty Bell Racing Association v. Philadelphia Tax Review Board, 86 Pa.Commonwealth Ct. 83, 483 A.2d 1063 (1984), in which we held that by enacting the Harness Horse Racing Meeting Corporations Act,[23] the legislature indicated its intent to preempt the field. Because this Act set forth a schema of taxation, specifically delineating those taxes which could be imposed on harness racing, we concluded that preemption extended to local taxation as well as regulation. Id.
Scott then considered our supreme court's opinion in Commonwealth v. Wilsbach Distributors, Inc., 513 Pa. 215, 519 A.2d 397 (1986), which held that state regulation of the liquor industry preempted imposition of a local tax on a beer distributor, noting the limited precedential value of Wilsbach in light of the far ranging differences among the justices with regard to the preemption doctrine.[24] Finally, Scott observed that in two more recent cases, we declined to apply the preemption doctrine. See Helsel, Inc. v. City of Harrisburg, 129 Pa.Commonwealth Ct. 1, 564 A.2d 546 (1989); Rieders v. Williamsport, *374 134 Pa.Commonwealth Ct. 298, 578 A.2d 618 (1990), appeal denied, 526 Pa. 643, 584 A.2d 324 (1991).
Although acknowledging our finding of preemption in Liberty Bell, Scott responded to the evolving case law in this area by concluding:
[W]e are very hesitant to expand the preemption doctrine and declare new industries to be off limits to local taxation. Each time that we do so, we act to further erode the tax base of local taxing bodies and we force those bodies to increase the tax burden on other taxpayers.

Id. 144 Pa.Commonwealth Ct. at 381, 601 A.2d at 878.
In their brief, Appellants attempt to show that the insurance industry is so pervasively regulated by the state that it preempts all local taxation of insurance companies, including Philadelphia's realty transfer tax. We do not presume to answer this question in regard to every local tax which may be imposed on insurance companies; however, after reviewing those regulations pointed out by Appellants, we see no evidence that the legislature, by enacting these measures, intended insurance companies to be exempt from local taxation on transfers of real estate. State regulation of the insurance industry, albeit extensive, does not preempt Philadelphia from imposing its realty transfer tax on Appellants here.

IV. CONCLUSION
We have determined that the trial court erred in two different portions of its opinion. In its determination that the 1% exception did not violate uniformity, and again in its analysis of regulatory preemption, we have uncovered flaws in the trial court's interpretation of the law.[25] However, this is, at most, harmless error; our own analysis of these two issues, *375 although different from that employed by the trial court, has led us to the same conclusions. We may still affirm the trial court, if its decision was correct, even though the reasons given to sustain that result were erroneous. Wright v. Department of Transportation, 142 Pa.Commonwealth Ct. 91, 596 A.2d 1241 (1991), appeal denied, 530 Pa. 650, 607 A.2d 258 (1992). For the reasons set forth in this opinion, we affirm that order now.

ORDER
AND NOW, this 5th day of February, 1993, the order of the Court of Common Pleas of Philadelphia County, dated March 5, 1991, is affirmed on the grounds set forth in this opinion.
NOTES
[1] This matter was argued before a panel consisting of Judge Doyle, Judge Friedman and Senior Judge Lederer. Because of the conclusion of Senior Judge Lederer's service, the case was submitted on briefs to President Judge Craig for his consideration as a member of the panel.
[2] As a result, Equitable and Remm now own 100% of Associates, which in turn owns 8 Penn Center in Philadelphia. For the sake of simplification and understanding, we offer this diagram of the transaction.

IMAGE
[3] With the adoption of Bill No. 567, the City of Philadelphia attempted to close perceived loopholes in its realty transfer tax law. Prior to its enactment, the City of Philadelphia did not impose realty transfer tax on transfers of interests in corporations or partnerships holding Philadelphia real estate if legal title to the real estate remained in the name of the holding entity. Thus, taxpayers were able to circumvent the tax by transferring interests in corporations or partnerships holding real estate. This effectively transferred property rights in the real estate without transferring the real estate itself. By enacting Bill No. 567, later superseded by Bill No. 1259, City Council intended to ensure that all transfers of real estate, however effected, would be subject to the tax. The portion of Bill No. 567 entitled "legislative findings", Philadelphia Code § 19-1401, indicates City Council's intent:

(1) Numerous tax advantages offered by taxing authorities to entities primarily engaged in the business of developing and owning real estate make it advantageous for them to do business as corporations or partnerships.
(2) The sale of corporate securities or partnership shares of a corporation or partnership, the majority of whose tangible assets consist of real estate holdings, is a transfer of equitable ownership of real estate and is effectively a transfer of the real estate ownership itself.
(3) The avoidance of the payment of real estate transfer taxes by virtue of the legal structuring of the ownership of real estate results in the inequitable tax treatment for those individuals who transfer real estate or who are unable to avail themselves of other tax advantages enjoyed by corporations and partnerships.
(4) To the extent that real property of a corporation or partnership is located in Philadelphia the effective transfer of ownership of that real estate by the sale of corporate securities or partnership shares should be subject to the Realty Transfer Tax to the extent that the sale of corporate securities and partnership shares represents a percentage change in the ownership of the corporation or partnership.
(5) The transfer of the ownership, equitable or otherwise, of real estate situate within the corporate boundaries of the City is the exercise of a privilege within the City, notwithstanding that documents, including certificates of transfer and any instrument relating to the sale or acceptance of a security or share of a real estate corporation or partnership, evidencing such transfer are made, executed, issued, delivered or accepted outside of the corporate boundaries of the City. Any provision of this Chapter notwithstanding, it is the intention of City Council that the tax imposed hereunder is, in addition to the taxable conduct specified in § 19-1404, upon the privilege of transferring ownership of real estate within the City. Provided that, with each change in ownership, equitable or otherwise, the full amount of the tax imposed hereunder need only be paid once.
[4] Pursuant to Philadelphia Code § 19-1402(4)(d), as amended by Bill No. 567, the "value of real estate" with respect to the sale or acceptance of securities or shares of a real estate corporation is the actual monetary worth of the real estate, which shall not be less than the current assessed market value of such real estate for local tax purposes. The value of the real estate holdings owned by Eight Penn on February 14, 1986 was $16,335,000.00; thus, assuming that the sale of its stock was taxable, the total tax owed on the transaction is $408,375.00.
[5] Our scope of review on appeal from the grant of a motion for summary judgment is limited to determining whether the trial court committed legal error or manifestly abused its discretion. Kelly v. Curwensville Area High School, 141 Pa.Commonwealth Ct. 449, 595 A.2d 787 (1991).
[6] Act of August 5, 1932, P.L. 45, as amended, 53 P.S. § 15971, commonly referred to as the Sterling Act.
[7] L.J.W. has been criticized on unrelated grounds. See Wanamaker v. Philadelphia School District, 441 Pa. 567, 274 A.2d 524 (1971); Quaid v. Philadelphia Tax Review Board, 188 Pa.Superior Ct. 623, 149 A.2d 557 (1959).
[8] Appellants contend that the City lacks the authority to impose the recording requirement on nonresidents, asserting that under a strict construction of the Sterling Act, as required by Pennsylvania law, Alan Wood Steel Co. v. School District of Philadelphia, 425 Pa. 455, 229 A.2d 881 (1967), the City is prohibited from imposing its transfer tax on Appellants based on any claimed "nexus" that Appellants may have with the City. However, Appellees claim that under the "Provide for the assessment and collection . . ." clause of the Sterling Act, they are permitted to require nonresidents who transfer Philadelphia real estate to file a certificate of transfer and impose tax thereon just as the City can require nonresidents who conduct a business in Philadelphia or perform services in Philadelphia to file tax returns, based upon their activity within and nexus to the City. Alan Wood.
[9] Although these cases state that a corporation is normally regarded as separate and distinct from its shareholders, they emphasize that this legal fiction was designed only to serve convenience and justice, and may be disregarded when circumstances warrant it. Ashley.
[10] For this reason, Appellants contend that Health Group is inapplicable here. We disagree. This distinction is important only as it relates to the question of whether a transfer of property in a municipality can be taxed if the actual transfer of documents takes place outside the city. In Health Group, we noted that the LTEA, unlike the Sterling Act, specifically allowed for taxing transfers of real property where the transactions transferring the property took place outside the city. However, we do not rely on Health Group to determine whether Philadelphia, under the Sterling Act, could tax transfers of stock in real estate corporations where the transfer occurred beyond the City limits, but for a different proposition entirely.
[11] The trial court also notes that the tax is not levied at regular intervals, like a personal property tax would be, nor is it imposed on the mere ownership of stock as a personal property tax would be, but is imposed only on the transfer of an ownership interest. Commonwealth v. Stewart, 338 Pa. 9, 12 A.2d 444 (1940), aff'd, 312 U.S. 649, 61 S.Ct. 445, 85 L.Ed. 1101 (1941).
[12] In matters of taxation, allegations of violations of the equal protection clause of the United States Constitution and the uniformity clause of the Pennsylvania Constitution are analyzed in the same manner, requiring equality of burden upon classes or things subject to the tax in question. Aldine Apartments, Inc. v. Commonwealth, 493 Pa. 480, 426 A.2d 1118 (1981); Commonwealth v. Westinghouse Electric Corp., 478 Pa. 164, 386 A.2d 491, appeal dismissed, 439 U.S. 805, 99 S.Ct. 61, 58 L.Ed.2d 97 (1978).
[13] Allentown has been criticized and questioned on unrelated grounds.
[14] Previously, our courts have upheld classifications as reasonable by recognizing these bases for differentiating between subjects of taxation. For example, in Crosson, where a tax exempting minors was challenged on uniformity grounds, the court noted that the age of majority supports many distinctions outside the tax arena. Moreover, the court concluded that while revenues derived from taxing occupations of minors would be small, the difficulty of collecting the tax would be relatively great. In City of Philadelphia v. Farrell, 205 Pa.Superior Ct. 263, 209 A.2d 867 (1965), it was determined that membership in the armed forces entitled exemption from payment of wage tax because it represented a sacrifice which should be recognized as a matter of public policy. In Life Assurance, the court approved a distinction between various types of insurance companies, recognizing that insurance companies also were classified for purposes unrelated to matters of taxation in ways accepted by both the Commonwealth and the industry. The court also noted the understandable business differentiations between tax subjects in Allentown and determined that wholesale and retail vendors could be taxed differently without running afoul of the Uniformity Clause.

However, courts have consistently rejected classifications based solely on quantitative rather than qualitative factors. For instance, in American Stores, the court struck down a license tax on stores and theaters where the tax amount owed depended only upon the number of stores operated. In Amidon v. Kane, 444 Pa. 38, 279 A.2d 53 (1971), the court struck down a personal income tax which, although purporting to impose a flat 3.5% tax upon income, actually imposed different tax rates on identical income amounts.
[15] In addition, Appellants point out that it is improper for the City to conclude that such transactions are de minimis when a transfer of 1% or less in one case may be equal to or substantially greater in value than the more than 1% transfer in another case because the tax is calculated based on the "value" of the property being transferred. Moreover, Appellants note that the 1% exception cannot be justified on grounds of administrative convenience, since the percentage of interest transferred in no way affects the difficulty of collecting the tax, particularly where, as here, the transfer tax is a self-assessed tax.
[16] Section 19-1403 then continues with specific exclusions from the requirement, none of which are relevant here.
[17] Section 19-1404(2) states:

Every person who sells or accepts a security or share of a real estate corporation or partnership, which in effect is the transfer of the ownership of real estate situate within the City, excepting sales or acceptances relating to transactions for which a certificate of transfer is not required pursuant to § 19-1403, or executes or accepts a certificate of transfer, or on whose behalf a certificate of transfer is executed or accepted shall pay therefore and in respect thereof, or for and in respect of the paper upon which such certificate is written or printed, a tax at the rate of two and five-tents percent (2.5%) of the value as provided in § 19-1402(4)(a), which tax shall be payable at the time of sale.
[18] Appellants argue that they have already paid for the provision of these municipal services through real estate taxes, water and sewer charges, fire inspection fees and other municipal assessments imposed on property owners. We are not swayed by this reasoning. A similar argument was raised in Memphis Natural Gas Co. v. Stone, 335 U.S. 80, 68 S.Ct. 1475, 92 L.Ed. 1832 (1948), and the Court concluded that Mississippi's imposition of one type of tax, exacted from a foreign corporation as recompense for maintaining and manning that company's facilities located within the state, did not suggest that these local incidents had been "fully taxed," preventing the imposition of any additional taxes. The Court stated: "No reason is perceived why Mississippi cannot exact this different tax for the same protection. . . . The power to levy such a new tax is not and could not be questioned except as an interference with commerce." Id. at 85, 68 S.Ct. at 1477.
[19] Act of May 17, 1927, P.L. 789, as amended, 40 P.S. §§ 1-321.
[20] Act of May 17, 1921, P.L. 682, as amended, 40 P.S. §§ 341-991.
[21] Act of March 4, 1971, P.L. 6, as amended, 72 P.S. §§ 7801 and 7901.
[22] Section 701 of the Bank Shares Tax Act, Act of March 4, 1971, P.L. 6, 72 P.S. § 7701, exempts banks that pay the shares tax from local taxation on "the shares, and so much of the capital and profits . . . as shall not be invested in real estate." In fact, Appellees point out that even state entities such as banks pay realty transfer taxes. We also note that the shares tax on domestic title insurance companies, imposed under section 801 of the Title Insurance and Trust Companies Shares Tax Act, Act of March 4, 1971, P.L. 6, 72 P.S. § 7801, which Appellants cite as an example of the Commonwealth's comprehensive taxation scheme for insurance companies, contains the same real estate exception that appears in the Bank Shares Tax.
[23] Act of December 22, 1959, P.L. 1978, formerly 15 P.S. §§ 2601-2625, repealed by the Act of December 17, 1981, P.L. 435; 4 P.S. §§ 325.101-325.402.
[24] The court in Scott noted that in Wilsbach, several of our supreme court justices expressed serious doubts about the rationale of Allegheny Valley Bank as an unwarranted blurring of the lines between regulatory power and taxation power. Additionally, in footnote 4 of the Scott opinion, we comment on the fact that at least three current justices appear to disagree entirely with the preemption doctrine, and a fourth justice would limit the doctrine's application to situations, such as that in Allegheny Valley Bank, where the state's overriding concern is protection of the financial soundness of the industry in question.

We hasten to note, however, that even if Wilsbach's precedential value were unquestioned, it would not alter our decision here. Wilsbach, like Allegheny Valley Bank, found that a local business privilege tax was invalid because it impermissibly impinged on an area absolutely controlled by the state. However, although concluding that this area was an improper subject for taxation by the city, the court in Wilsbach reaffirmed that the appellant was not exempt from all municipal taxation.
[25] The trial court erred by determining that the 1% exception, used as a means of separating de minimis transactions, was a reasonable classification and so did not resort to severability to salvage the constitutionality of this tax provision. In addition, the trial court erred in its analysis of Appellants' preemption argument by relying on Prudential Insurance Co. of America v. Pittsburgh, 38 Pa.Commonwealth Ct. 15, 391 A.2d 1326 (1978). This case dealt with the issue of tax preemption rather than regulatory preemption, and therefore was improperly applied here.