## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Online Merchants Guild,           :
                Petitioner    :
                                 :

      v.                      : No. 179 M.D. 2021
                                 :

C. Daniel Hassell, in his official   :
capacity as Secretary of Revenue,   :
Department of Revenue,           :
                Respondent  : Argued: June 22, 2022

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE LORI A. DUMAS, Judge

OPINION
BY JUDGE CEISLER                       FILED: September 9, 2022

Before this Court are cross-applications for summary relief filed by C. Daniel Hassell, the Secretary of Revenue (Revenue), and the Online Merchants Guild (Guild), a trade association comprised of online businesses that sell merchandise through Amazon's Fulfillment by Amazon (FBA) Program.[1] The key issue before this Court is whether non-Pennsylvania businesses that sell merchandise through Amazon's FBA Program must collect and remit Pennsylvania sales tax pursuant to

---

[1]As described on Amazon's website, the FBA Program is an Amazon service through which "businesses outsource order fulfillment to Amazon. Businesses send products to Amazon fulfillment centers and[,] when a customer makes a purchase, [Amazon will] pick, pack, and ship the order. [Amazon] can also provide customer service and process returns for those orders." *See* https://sell.amazon.com/fulfillment-by-amazon?ld=seussoagoog-sitelink-fba2-D (last visited September 8, 2022).

Section 237(b)(1) of the Tax Reform Code of 1971 (Tax Code),[2] which provides that "[e]very person maintaining a place of business" in the Commonwealth of Pennsylvania (Commonwealth) must collect and remit Pennsylvania sales tax, or pay personal income tax (PIT) pursuant to Section 302(b) of the Tax Code,[3] which imposes PIT at a rate of 3.75 % upon nonresidents for income derived "from sources within this Commonwealth."

After careful review, we hold that Revenue has failed to provide sufficient evidence that non-Pennsylvania businesses selling merchandise through the FBA Program (FBA Merchants), and whose connections to the Commonwealth were only shown to be limited to the storage of merchandise by Amazon in one of Amazon's Pennsylvania warehouses, have sufficient contacts with the Commonwealth such that Revenue can mandate they collect and remit sales tax or pay PIT pursuant to Sections 237(b)(1) and 302(b) of the Tax Code. Accordingly, we grant the Guild's cross-application for summary relief and deny the cross-application for summary relief filed by Revenue.

## I. Background

Before engaging in a recitation of the relevant facts in this matter, it is helpful to first review the legal precedent governing when a state may exercise jurisdiction over a nonresident business, as well as the pertinent provisions of the Tax Code.

### A. Case Law

Whether a person or entity may be liable for taxes revolves around the well established notion that the potentially liable party must have "minimum contacts" with the forum jurisdiction. *Wirth v. Commonwealth*, 95 A.3d 822 (Pa. 2014). In

---

[2] Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. § 7237(b)(1).

[3] Added by the Act of August 4, 1991, P.L. 97, 72 P.S. § 7302(b).

*Quill Corporation, Inc. v. North Dakota*, 504 U.S. 298 (1992), the United States (U.S.) Supreme Court reviewed whether a North Dakota taxing statute impermissibly required an out-of-state mail-order business, which had neither retail outlets nor sales representatives in North Dakota, to collect and remit North Dakota's use tax, in violation of Section 1 of the Fourteenth Amendment of the U.S. Constitution (Due Process Clause)[4] and Article I, Section 8, Clause 3 of the U.S. Constitution (Commerce Clause).[5] Quill Corporation, Inc. (Quill), a purveyor of office equipment and supplies, solicited business to North Dakota residents through catalogs and flyers, magazine advertisements, and telephone calls. *Id.* at 302. The North Dakota taxing statute required any retailer, defined as any person engaging in regular or systematic solicitation of a consumer market in the state, to collect a "use tax" for any property purchased for storage, use, or consumption within the state. *Id.* In analyzing the constitutionality of the use tax, as applied to Quill, the U.S. Supreme Court noted that the Due Process Clause and Commerce Clause reflected different constitutional concerns, and a taxing statute that comported with due process may nonetheless violate the Commerce Clause. *Id.* at 305-06. A due process analysis typically encompassed the concepts of notice and fair warning and looked to "the fundamental fairness of government activity" and whether a state's exercise of power over a nonresident was legitimized by the nonresident's connections to that state. *Id.* at 312. A Commerce Clause analysis, conversely, was "informed . . . by structural concerns about the effects of state regulation on the national economy."

---

[4] The Due Process Clause relevantly provides that no state shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

[5] The Commerce Clause provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce with foreign [n]ations, and among the several States, and with the Indian Tribes." U.S. Const. art. I § 8, cl. 3.

3

*Id.* A tax would sustain against a Commerce Clause challenge where it: (1) applied to an activity with a substantial nexus to a taxing state; (2) was fairly apportioned; (3) did not discriminate against interstate commerce; and (4) was fairly related to the services provided by the state. *Id.* at 311 (citing *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1992)).

As to Quill's activities in North Dakota, the U.S. Supreme Court held that Quill "purposely directed its activities at North Dakota residents [and] the magnitude of those contacts" was sufficient to withstand a due process challenge. *Id.* at 308. Regarding the Commerce Clause, however, the U.S. Supreme Court reaffirmed its prior determination in *National Bellas Hess, Inc. v. Department of Revenue of Illinois*, 386 U.S. 753 (1967) (overruled by *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018)), that an out-of-state vendor whose only contacts with the taxing state were by mail or common carrier lacked the substantial nexus required. *Quill*, 504 U.S. at 317. Accordingly, as Quill did not have a physical presence in North Dakota, the Commerce Clause shielded it from collecting and remitting the North Dakota use tax. *Id.* at 302.

In 2018, after recognizing changes in the marketplace brought about by internet sales, the U.S. Supreme Court explicitly overruled *Quill* in *Wayfair*, which concerned a South Dakota act that required out-of-state sellers to collect and remit sales tax "as if" they had a physical presence in the state. Relying on *Quill*, the South Dakota Supreme Court had affirmed a lower court decision invaliding the act, which applied to sellers delivering more than $100,000 in goods or services, or engaging in more than 200 transactions for the sale of goods or services, into the state. 138 S. Ct. at 2089. The U.S. Supreme Court rejected the physical presence requirement in *Quill* as unsound, given that a business with a single salesperson located in a

4

particular state would be required to collect and remit sales tax but a business with identical sales and a website accessible in every state would not. *Id.* at 2093. The U.S. Supreme Court noted that the Commerce Clause was designed to prevent states from engaging in economic discrimination, not to relieve those engaged in interstate commerce from their share of a state's tax burden. *Id.* at 2093-94. *Quill* undermined these precepts, as it put local, and many interstate businesses, at a competitive disadvantage relative to remote sellers. *Id.* at 2094. In the absence of *Quill's* physical presence requirement, the U.S. Supreme Court turned to the first prong of the test identified in *Complete Auto*, which simply asked whether a tax applied to an activity with a substantial nexus to the taxing authority. *Id.* at 2099. The South Dakota act only applied to those out-of-state sellers delivering more than $100,000 in goods or services or engaging in 200 or more separate transactions delivering goods and services, a quantity of business that the U.S. Supreme Court felt "could not have occurred unless the seller availed itself of the substantial privilege of carrying on business in South Dakota." *Id.* As the *Wayfair* respondents were large national companies with an extensive presence, the substantial nexus requirement in *Complete Auto* was satisfied. *Id.*[6]

While Pennsylvania courts have not yet addressed the narrow issue of whether a nonresident business that stores merchandise in a Pennsylvania warehouse is subject to the sales tax and PIT provisions of the Tax Code, they have reviewed whether due process is implicated by the imposition of taxes on nonresidents. In *Equitable Life Assurance Society of the United States v. Murphy*, 621 A.2d 1078 (Pa. Cmwlth. 1993), this Court relevantly addressed whether a realty transfer tax imposed

---

[6] Because other principles that might invalidate the South Dakota act had not been litigated, the U.S. Supreme Court vacated the judgment of the South Dakota Supreme Court and remanded the matter for further proceedings. *Wayfair*, 138 S. Ct. at 2100.

5

by the City of Philadelphia (City) on the sale of a nonresident's real property violated the Due Process and Commerce Clauses of the U.S. Constitution. We recognized that the "minimal connection between" the taxing authority and the person it sought to tax required that the taxes imposed bear a rational relationship "to the protections, opportunities[,] and benefits given by the taxing authority." *Id.* at 1091 (internal citations omitted). "The simple but controlling question" concerned whether the taxing authority had "given *anything* for which it [could] ask [in] return." *Id.* (emphasis in original). Although the settlement disposing of the real property took place out of state, the real property itself was located in the City, which created the connection required to withstand a claim under the Due Process Clause. *Id.* at 1092. The realty transfer tax also survived the appellants' Commerce Clause challenge, as it satisfied the test outlined in *Complete Auto. Id.* at 1093. The realty transfer tax had a substantial nexus with the City, as it only applied to transfers of real property located within the City's jurisdiction. *Id.* at 1093. The tax was fairly apportioned, which meant that it could not be imposed a second time by another jurisdiction and that it "reasonably reflect[ed] the in-state component of the activity being taxed[,]" because only the City, and no other locality, could tax sales of real estate located within its borders, and the only portion of the transaction subject to taxation was that which involved the transfer of City real estate. *Id.* The tax was deemed nondiscriminatory, as it applied at the same rate to both residents and nonresidents. *Id.* Finally, the tax was fairly related to the municipal services provided by the City to owners of real property located therein. *Id.* at 1093-94.

In *Marshall v. Commonwealth*, 41 A.3d 67 (Pa. Cmwlth. 2012), this Court upheld Revenue's imposition of PIT on Robert Marshall (Marshall), a nonresident partner of a Connecticut limited partnership (Partnership) that owned the U.S. Steel

6

Tower, a 64-story office building, and the underlying parcel of land, located in Pittsburgh, Pennsylvania. Marshall challenged the PIT on several grounds, including due process, arguing that he lacked minimum contacts with the Commonwealth.[7] *Id.* at 73. This Court rejected Marshall's due process argument, as the Partnership's primary purpose was ownership and maintenance of the U.S. Steel Tower. *Id.* at 74. Marshall "purposefully availed himself of the opportunity to invest in Pennsylvania real estate through [the Partnership,]" which provided sufficient minimum contacts for the imposition of PIT after the Partnership disposed of the property. *Id.*

Our Supreme Court reached the same conclusion in *Wirth*, which consolidated an appeal from our decision in *Marshall* with appeals filed by other nonresident partners of the Partnership. The Supreme Court noted that the analysis of the appellants' due process claims, and whether they could be liable for PIT, considered whether they had minimum contacts with Pennsylvania. *Id.* at 837. Whether minimum contacts existed turned on whether the appellants could "reasonably anticipate being taxed upon a taxable event." *Id.* The Supreme Court agreed with Revenue that the primary purpose of the Partnership was "to own, operate, and gain income from" the U.S. Steel Tower. *Id.* at 839. As a result, through the Partnership's ownership and operation of the U.S. Steel Tower, the appellants "purposefully availed themselves" of Pennsylvania law, thus establishing minimum contacts within Pennsylvania. *Id.*

## B. The Tax Code

Section 202(a) of the Tax Code, 72 P.S. § 7202(a), imposes a six percent tax "upon each separate sale at retail of tangible personal property or services[.]"

---

[7] Because Marshall failed to properly develop his argument that Revenue's action violated the Commerce Clause, we deemed the issue waived. *Marshall*, 41 A.3d at 73.

7

Pursuant to Section 237(b)(1) of the Tax Code, 72 P.S. § 7237(b)(1), Pennsylvania sales tax must be collected and remitted by "[e]very person maintaining a place of business" in the Commonwealth.[8]  Further, any person that is required to collect Pennsylvania sales tax from another person, and that fails to do so, shall be liable for the full amount of the tax that should have been collected.

The Department of Revenue (Department), or its agents, is authorized by Section 272 of the Tax Code to "**examine** the books, papers[,] and **records of any taxpayer** in order to verify the accuracy and completeness of any return made or, if no return was made, to ascertain and assess the tax imposed by [the Tax Code]." 72 P.S. § 7272 (emphasis added).  "Taxpayer" is defined in Section 201(n) of the Tax Code, 72 P.S. § 7201(n), as "[a]ny person required to pay or collect the tax imposed by [the Tax Code.]"  Section 272 further provides that the Department may "examine any person, under oath, concerning taxable sales or use by any taxpayer or concerning any other matter relating to the enforcement or administration of [the Tax Code], and to this end may compel the production of books, papers[,] and records and the attendance of all persons whether as parties or witnesses whom it believes to have knowledge of such matters.  The procedure for such hearings or examinations shall be the same as that provided by The Fiscal Code[9] relating to inquisitorial powers of fiscal officers."  *Id.*  The relevant provision of The Fiscal Code, Section 1602(a), grants the Secretary of Revenue, for the purpose of determining the amount of taxes owed, and the collection thereof, authority to examine a taxpayer's records and to compel the production of records and the

---

[8] "Person" includes "[a]ny natural person, association, fiduciary, partnership, corporation[,] or other entity[.]"  Section 201(e) of the Tax Code, 72 P.S. § 7201(e).

[9] Act of April 9, 1929, P.L. 343, *as amended*, 72 P.S. §§ 1-1805.

8

attendance of any person, whether a party or witness, deemed necessary for the investigation and examination of "any public account[.]" 72 P.S. § 1602(a). Should a person neglect or refuse to produce the records requested by the Secretary of Revenue, Section 1602(c) of The Fiscal Code, 72 P.S. § 1602(c), authorizes the issuance of a summons "directed to the sheriff of the county in which the person" resides to procure the records.

"Maintaining a place of business in this Commonwealth" is defined, in relevant part, as follows:

> (1) **Having, maintaining or using** within this Commonwealth, either **directly or through a subsidiary, representative or an agent**, an office, distribution house, sales house, **warehouse**, service enterprise or other place of business; or any agent of general or restricted authority, or representative, irrespective of whether the place of business, representative or agent is located here, permanently or temporarily, or whether the person or subsidiary maintaining the place of business, representative or agent is authorized to do business within this Commonwealth.
>
> (2) **Engaging in any activity as a business** within this Commonwealth by any person, **either directly or through a subsidiary, representative or an agent**, **in connection with** the lease, **sale or delivery of tangible personal property** or the performance of services thereon for use, storage or consumption or in connection with the sale or delivery for use of the services described in subclauses (11) through (18) of clause (k) of this section, **including**, but not limited to, **having, maintaining or using any** office, distribution house, sales house, **warehouse** or other place of business, any stock of goods or any solicitor, canvasser, salesman, representative or agent under its authority, at its direction or with its permission, regardless of whether the person or subsidiary is authorized to do business in this Commonwealth.
>
> . . . .

9

(3.5)(i) Engaging in any activity as a business by any person, either directly or through a subsidiary, representative or an agent, in connection with the lease, sale or delivery of tangible personal property into this Commonwealth or the performance of services for use, storage[,] or consumption[,] or in connection with the sale or delivery for use in this Commonwealth of at least [$100,000] during the preceding twelve-month calendar period.[10]

72 P.S. § 7201(b) (emphasis added).

Section 201 of the Tax Code contains several terms that are specifically germane to Internet sales,[11] as follows:

(hhh) "Forum." A place where sales at retail occur, whether physical or electronic. The term includes a store, a booth, an Internet website, a catalog[,] or similar place.

(iii) "Marketplace facilitator." A person that facilitates the sale at retail of tangible personal property. For purposes of this article, a person facilitates a sale at retail if the person or an affiliated person:

(1) lists or advertises tangible personal property for sale at retail in any forum; and
(2) either directly or indirectly through agreements or arrangements with third parties, collects the payment from the purchaser and transmits the payment to the person selling the property.

The term includes a person that may also be a vendor.

(jjj) "Marketplace seller." A person that has an agreement with a marketplace facilitator to facilitates sales for that person.

---

[10] Section 201(b)(3.5)(i) of the Tax Code was added by the Act of June 28, 2019, P.L. 50, No. 13 (Act 13), 72 P.S. § 7201(b)(3.5)(i).

[11] Added by Section 1 of Act 13.

10

72 P.S. § 7201(hhh), (iii), and (jjj).

Section 237(b.1) of the Tax Code provides that a marketplace facilitator maintaining a place of business in the Commonwealth must collect and remit Pennsylvania sales tax on all sales, leases, and deliveries of tangible personal property by marketplace sellers whose sales are facilitated through the marketplace facilitator's forum.[12]

### C. Factual Background

Turning to the instant matter, in an agreement executed between Amazon and Revenue on January 30, 2012 (2012 Agreement), Amazon agreed to voluntarily collect and remit Pennsylvania sales tax on its internet sales. Deposition of Kevin Milligan,[13] 3/23/22, at 63; Guild's Br., Ex. 4. The 2012 Agreement focused on the collection of sales tax for goods owned and sold by Amazon. Milligan dep. at 71. In 2017, Revenue began developing a strategy for collecting sales tax from FBA Merchants that had a physical presence in the Commonwealth. *Id.* at 80-82. This strategy coincided with the enactment of the Act of October 30, 2017, P.L. 672 (No. 43), which added provisions to the Tax Code addressing the collection of sales tax for online sales. *Id.* at 126, 145. Shortly thereafter, Amazon and Revenue entered into a second agreement whereby, effective April 1, 2018, Amazon would collect and remit Pennsylvania sales tax on FBA sales (2018 Agreement). *Id.* at 157. The 2018 Agreement also provided that Amazon would not be liable for any sales tax

---

[12] 72 P.S. § 7237(b.1).

[13] Milligan is the special advisor to Revenue's deputy secretary of taxation. Milligan dep., 3/23/22, at 9.

11

owed for FBA sales made prior to April 1, 2018.[14] *Id.* at 161, 171. FBA Merchants, who were not parties to the 2018 Agreement, remained obligated to pay any outstanding sales tax for pre-April 1, 2018 FBA sales and for any FBA sales made after that date "if Amazon messed up" and failed to collect sales tax. *Id.* at 207.

On June 2, 2021, the Guild filed a petition for review (PFR) with this Court after its members received a Business Activities Questionnaire Request (Business Activities Request)[15] from Revenue indicating that they "may have" a physical presence in Pennsylvania that would require the collection and remittance of Pennsylvania sales tax and the payment of PIT. Stipulation ¶ 1(a). The Business Activities Request noted that, under the Tax Code, storing property, including inventory, at a distribution or fulfillment center, or at any other location within Pennsylvania, constituted a physical presence that created tax obligations, such as income and sales tax, that must be reported and remitted as of the date the property was first located within Pennsylvania. Emergency Relief Application, Ex. 1.

---

[14] During this same time period, the Commonwealth Department of Community and Economic Development issued its response to a request for proposal (RFP) issued by Amazon for the location of a second Amazon headquarters, offering Amazon up to $4.6 billion in financial assistance should it choose Pennsylvania as the site for its new headquarters. See https://s3.documentcloud.org/documents/5113274/Letter-SecretaryDavin-AmazonHQ2-RFP-1.pdf (last viewed September 8, 2022). On November 13, 2018, Amazon selected New York City, New York, and Arlington, Virginia, as the destinations for its new headquarters. See https://www.usatoday.com/story/tech/science/2018/09/12/timeline-amazons-search-hq-2-its-second-headquarters/1273275002/ (last viewed September 8, 2022). Amazon later abandoned plans to locate a headquarters in New York City. https://www.nytimes.com/2019/02/14/nyregion/amazon-hq2-queens.html (last viewed September 8, 2022).

[15] The declaration of Suzanne Tarlini, Director of Revenue's Bureau of Registration and Taxpayer Management, indicates that, as of March 23, 2021, Revenue mailed 11,263 Business Activities Requests to nonresident businesses *believed* to have a nexus with the Commonwealth. Guild's Br., Ex. 7; Revenue's Br., Ex. G.

Recipients of the Business Activities Request were offered the opportunity to participate in a voluntary compliance program (Compliance Program) that would assist them in complying with any past due tax obligations and that offered a limited lookback period that would relieve them of tax obligations accruing prior to January 1, 2019. *Id.* Businesses interested in participating were directed to complete and return a questionnaire to Revenue within 15 days of the Business Activities Request's date, which Revenue would thereafter review for purposes of determining the businesses' tax obligations. *Id.* Businesses deemed subject to Pennsylvania sales and income tax would be registered as such and notified of their tax collection and filing obligations. *Id.* The Business Activities Request further indicated that "[f]ailure to provide the information requested [would] result in **additional enforcement actions** and the business [would] forfeit any penalty relief or limited lookback provisions provided by the [Compliance Program]." *Id.* (emphasis added).

On June 3, 2021, the Guild filed an application for emergency relief, seeking a stay of Revenue's June 8, 2021 deadline for complying with the Business Activities Request. Then-President Judge Brobson denied the application as moot after Revenue agreed to extend the deadline to June 22, 2021.[16] Following a June 9, 2021 status conference, the parties agreed to file cross-applications for summary relief, along with supporting briefs. Revenue's compliance deadline was extended pending this Court's disposition of their cross-applications for summary relief. June 30, 2021 Stipulation, ¶ 5.

Prior to initiating the instant action, on February 26, 2021, the Guild filed a complaint for declaratory and injunctive relief with the United States District Court for the Middle District of Pennsylvania (District Court), arguing that Revenue's

---

[16] The June 8, 2021 extension was itself an extension of the original May 8, 2021 deadline agreed to by the parties. Emergency Relief Application, Ex. 5.

attempts to collect Pennsylvania sales tax from the Guild's members violated their constitutional rights. June 30, 2021 Stipulation, ¶ 1.[17] As part of the District Court action, Scott Moody (Moody), a Guild member and nonresident FBA Merchant, testified that he began selling merchandise through the FBA Program in September 2018. Emergency Relief Application, Ex. 2, Notes of Testimony (N.T.), 4/29/21, at 9, 13, 48. Moody related that, in addition to conducting its own first-party online sales, Amazon permits third-party merchant sales that are fulfilled directly by the merchant. *Id.* at 14. Conversely, FBA sales are, as the name suggests, fulfilled entirely by Amazon, which collects payment from the customer and ships the merchandise directly from an Amazon warehouse. *Id.* at 23. To participate in the FBA Program, an FBA Merchant submits a list of its inventory to Amazon, which is then shipped to a location designated by Amazon. *Id.* at 24. An FBA Merchant cannot select the warehouse to which its merchandise will be shipped, unless it pays a fee to participate in an "inventory placement service" that enables the FBA Merchant to direct its shipments to certain locations. *Id.* at 26, 37. This service only governs the initial shipment of merchandise to Amazon, as the FBA Merchant retains "no further control" over merchandise received by Amazon, unless the FBA Merchant elects to withdraw its products from sale on Amazon. *Id.* at 26. Following the sale of its merchandise through the FBA Program, an FBA Merchant receives payment from Amazon, minus funds withheld "to cover potential refunds." *Id.* at 24. FBA Merchants have no contact with the customers that purchase their merchandise. *Id.* at 36.

---

[17] The District Court ultimately dismissed the Guild's complaint, as it concerned an unsettled matter of Pennsylvania law. June 30, 2021 Stipulation, ¶ 1; Emergency Relief Application, Ex. 4.

Moody testified that he received a Business Activities Request from Revenue in early 2021 indicating that his business may be subject to Pennsylvania sales and income tax due to the storage of merchandise in one of Amazon's Pennsylvania warehouses. *Id.* at 40; Emergency Relief Application, Ex. 1. Moody stated that he could not verify his business activity in Pennsylvania because he could not identify how much of his FBA inventory was stored there. N.T., 4/29/21, at 40, 47. He believed that Amazon collected sales tax on FBA sales when he initially began participating in the FBA Program in 2018. *Id.* at 44. Moody conceded during cross-examination that the FBA agreement he executed with Amazon provides that he is responsible for collecting, reporting, and paying any taxes that Amazon has not collected and remitted on his behalf. *Id.* at 50. Moody also acknowledged that he owns the merchandise offered through the FBA Program until a customer pays for it. *Id.* at 53. He agreed that he had neither received any tax assessments from Revenue, nor had he been contacted by Revenue's criminal tax section or its Bureau of Audits. *Id.* at 57-58.

Following the submission of briefs in support of the parties' cross-applications for summary relief and oral argument, which took place on June 22, 2022, this matter is now ready for our disposition.

## II.    Issues

The primary issue before this Court is whether FBA Merchants are subject to the sales tax and PIT provisions of the Tax Code because Amazon stored their merchandise in warehouses located in the Commonwealth.[18] Additionally, the Guild argues that Revenue lacks the authority to collect sales tax in a retroactive manner, that the relevant provisions of the Tax Code do not apply to the Guild's nonresident

---

[18] We have reordered the issues so that we may first address the Guild's constitutional claims.

15

members, and that Revenue's enforcement efforts violate the federal Internet Tax Freedom Act (ITFA).[19]

### III. Discussion

An application for summary relief is evaluated according to the standards for summary judgment. *Myers v. Com.*, 128 A.3d 846, 849 (Pa. Cmwlth. 2015). An application for summary relief may be granted if a party's right to judgment is clear and no issues of material fact are in dispute. *Id.* To be entitled to summary relief, the parties must demonstrate the nonexistence of any genuine issue of material fact. *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, (Pa. 1979).

First, we address whether imposition of the sales tax collection and remittance provisions in Section 237(b)(1) of the Tax Code on nonresident FBA Merchants implicates the Due Process Clause of the U.S. Constitution. A taxpayer challenging the constitutionality of tax legislation bears a heavy burden. *Leonard v. Thornburgh*, 489 A.2d 1349, 1351 (Pa. 1985). Tax legislation is presumed to be constitutionally valid and will only be declared unconstitutional where it "clearly, palpably, and plainly violates the Constitution." *Free Speech, LLC v. City of Phila.*, 884 A.2d 966, 971 (Pa. Cmwlth. 2005). Any doubts regarding the constitutionality of tax legislation should be resolved in favor of upholding the legislation. *Id.*

As already discussed herein, the Due Process Clause protects citizens from unfair tax burdens by limiting the power of states and their political subdivisions to impose extra-territorial taxation. *Equitable Life*, 621 A.2d at 1091 (internal citations omitted). To comply with due process, such taxation is restricted to cases in which there exists "some definitive link, some minimal connection, between the state and

---

[19] Pub. L. No. 105-277, Div. C. Title XI, §§ 1100-1104, 112 Stat. 2681 (1998) (current version at 47 U.S.C. § 151 note). The ITFA generally prohibits the imposition of any discriminatory tax on electronic commerce.

16

the person, property[,] or transaction it seeks to tax[.]" *Id.* The existence of minimum contacts requires "some act" by which an entity "purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." *Wirth*, 95 A.3d at 838 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The existence of such a link turns upon the individual facts of each case. *L.L. Bean, Inc. v. Com.*, 516 A.2d 820, 824 (Pa. Cmwlth. 1986). The placement of goods into the stream of commerce with an expectation that they will be purchased by a state's consumers may indicate purposeful availment; however, "as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum [s]tate*." J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011). As we noted in *Equitable Life*, "[t]he simple but controlling question is whether the taxing authority has given *anything* for which it [could] ask [in] return." *Equitable Life*, 621 A.2d at 1091 (emphasis in original).

The Guild argues that Revenue cannot establish sufficient minimum contacts exist that would bring the FBA Merchants within Revenue's jurisdictional reach. Amazon, not the FBA Merchants, controls the storage and shipment of goods in the FBA Program, and an FBA Merchant's mere participation in the FBA Program does not create meaningful contacts with the Commonwealth. At most, the Guild argues, it creates the possibility that Amazon would "unilaterally decide to store goods in Pennsylvania, as opposed to" a facility located in another state. Guild's Br. at 21.

Revenue concedes that a state must have personal jurisdiction over a nonresident business before it can require the payment of taxes. It argues, however, that the Business Activities Request sent to FBA Merchants is not a demand for tax payments. Rather, it is a "demand for information concerning potential tax liability,"

17

which Revenue has the authority to seek under Section 272 of the Tax Code. Revenue's Br. at 16. Revenue denies that the Compliance Program violates an FBA Merchant's due process rights, as any FBA Merchant declining to participate will receive notice of any adverse decision made by Revenue and the opportunity to appeal that decision. Revenue further contends that the Guild's due process claim is premature because no FBA Merchants have received a tax assessment from Revenue. Conversely, Revenue asserts that the FBA Merchants may not press a federal due process claim because they have not first taken advantage of any available administrative processes. Moreover, Revenue suggests that, by participating in the FBA Program, the FBA Merchants should have reasonably anticipated that they would incur tax liability in the Commonwealth.

While it appears that Revenue has not issued a tax assessment against any of the FBA Merchants, we do not agree that the Business Activities Request mailed by Revenue is merely a "demand for information." Rather, the Business Activities Request indicates that "[f]ailure to provide the information requested will result in **additional** enforcement actions," language that clearly suggests the existence of pending enforcement actions. Emergency Relief Application, Ex. 1 (emphasis added). We likewise reject Revenue's argument that the Guild's due process claim is premature, as it is not clear what, if any, administrative processes are available to the FBA Merchants, beyond their strict compliance with the dictates of the Business Activities Request. Moreover, the administrative process identified by Revenue, notice and the opportunity to appeal an adverse tax assessment, would be available only following a determination of tax liability. Essentially, if we correctly follow Revenue's reasoning, FBA Merchants, simply by virtue of having enrolled in the FBA Program, have placed themselves within Revenue's jurisdiction and thus have

18

no means to challenge Revenue's authority to investigate their records and determine their tax liability until after Revenue has investigated their records and determined their tax liability. This circuitous line of reasoning is unsupported by the statutory framework and controlling jurisprudence.

Critically, Revenue's investigative powers under Section 272 apply to the records of *taxpayers*, not individuals or entities Revenue *suspects* may be taxpayers. Furthermore, Section 272 does not grant Revenue the unfettered authority to seek business information from any person or entity it desires for the purpose of determining its status as a taxpayer. Due process requires a connection between the taxing authority and the person or entity it seeks to tax and "some act" indicating the alleged taxpayer has availed itself of the taxing authority's protections, opportunities, and services. *Wirth*, 95 A.3d at 838.

The record reflects that *Amazon* determines the location to which goods are shipped by an FBA Merchant. Even where an FBA Merchant has paid to participate in Amazon's "inventory placement service," an FBA Merchant has no control over its merchandise once Amazon receives it. Therefore, while an FBA Merchant may initially ship its merchandise to a Pennsylvania warehouse owned and operated by Amazon, whether the merchandise remains in that location is a decision made solely by Amazon. Once the merchandise is purchased by an Amazon customer, Amazon is responsible for shipping it to the customer. The identity and location of the purchaser is not disclosed to the FBA Merchant. Milligan, Revenue's special advisor to the deputy secretary for taxation, acknowledged during his deposition that FBA sales are made through Amazon's website, that Amazon collects payment for the purchased goods, and that Amazon is responsible for shipping the merchandise to the customer in an Amazon-branded box. Milligan Dep. at 136-37. We are hard

19

pressed to envision how, in these circumstances, an FBA Merchant has placed its merchandise in the stream of commerce with the expectation that it would be purchased by a customer located in the Commonwealth, or has availed itself of the Commonwealth's protections, opportunities, and services.

Regarding the imposition of PIT, the parties only briefly touch upon this issue in their respective principal and reply briefs. Revenue's argument, however, that FBA Merchants "may have outstanding [PIT] obligations" appears to be based on the same faulty proposition that, because Amazon *may* have stored an FBA Merchant's property in one of its Pennsylvania warehouses, an FBA Merchant has income sourced from within the Commonwealth. Without more, Revenue's argument must fail, as Revenue's power to examine a taxpayer's records under Section 272 of the Tax Code does not extend to demanding business information from every participant in Amazon's FBA Program, simply because Revenue suspects that person or entity "may be in violation of Pennsylvania's tax laws[.]" Revenue's Br. at 18. This Court came to a similar conclusion in *Bloomingdale's By Mail, Ltd. v. Department of Revenue*, 516 A.2d 827 (Pa. Cmwlth. 1986), and *L.L. Bean.*[20]

In both *Bloomingdale's* and *L.L. Bean*, the Department sought transactional sales data from nonresident mail order companies, Bloomingdale's By Mail, Ltd. (BBM) and L.L.Bean, Inc. (L.L. Bean). The Department also sought to compel the collection and remittance of Pennsylvania sales tax. In the case of L.L. Bean, its products were sold by V.F. Corporation (V.F.), an unrelated Pennsylvania corporation that owned and operated retail stores in the Commonwealth. *L.L. Bean*,

---

[20] While our decisions in *Bloomingdale's* and *L.L. Bean* were decided prior to *Wayfair*, the *Wayfair* decision only impacted the analysis of Commerce Clause claims. Our review in *Bloomingdale's* and *L.L. Bean* involved a due process analysis, which was unaffected by *Wayfair*.

516 A.2d at 823. The Department argued that V.F. was L.L. Bean's "representative" for purposes of Section 201(b)(2) of the Tax Code,[21] and, therefore, L.L. Bean maintained a place of business in the Commonwealth. This Court rejected the Department's argument that V.F. acted as L.L. Bean's representative, as L.L. Bean exerted no control over V.F., V.F.'s operation of its stores, or V.F.'s employees. *Id.* at 823. V.F. set the prices for merchandise sold at its stores, which used V.F.-branded shopping bags. *Id.* L.L. Bean's contacts with V.F. were limited to protecting L.L. Bean's trademark, providing advice on how to display L.L. Bean's goods and improve V.F.'s sales, and confirming the accuracy of L.L. Bean's record keeping. *Id.* at 823, 825. We also rejected the Department's argument that Section 272 of the Tax Code granted the Department authority to compel L.L. Bean's release of its transaction sales data for the purpose of collecting Pennsylvania sales tax from L.L. Bean's customers. *Id.* at 826. Section 272 of the Tax Code specifies that The Fiscal Code governs the procedure for investigating and examining a taxpayer's records. To that end, Section 1602(c) of The Fiscal Code, 72 P.S. § 1602(c), authorizes the issuance of a summons directed "to the sheriff of the county in which the person or persons reside[.]" We construed this provision as limiting the Department's investigative power to in-state residents, a construction bolstered by Section 273 of the Tax Code, which requires that common carriers delivering goods by a nonresident shipped to the Commonwealth "maintain adequate records of such deliveries[.]" 72 P.S. § 7273; *L.L. Bean*, 516 A.2d at 826. We reasoned that Section 273 would be rendered superfluous if the General Assembly intended that Section 272 of the Tax Code apply to nonresidents. Therefore, we held that Section 272 did

---

[21] The 2019 amendments to the definition of "maintaining a place of business in this Commonwealth" do not affect this Court's analysis of *L.L. Bean.*

21

not grant the Department broad power to obtain the records of a nonresident. *L.L. Bean*, 516 A.2d at 826.

The sole issue in *Bloomingdale's* concerned whether the Department had authority under Section 272 of the Tax Code to compel the attendance of out-of-state witnesses and the production of out-of-state documents. Relying on *L.L. Bean*, we held that the Department's subpoena power under Section 272 of the Tax Code could only be utilized "within the borders of the Commonwealth." *Bloomingdale's*, 516 A.2d at 829.

To paraphrase the question we posed in *Equitable Life*, the record fails to disclose what, if anything, the Commonwealth has given the FBA Merchants "for which it can ask [in] return." *Equitable Life*, 621 A.2d at 1091. Furthermore, Revenue's investigative powers under Section 272 may not be utilized against persons or records located outside the Commonwealth. Accordingly, we grant the Guild's cross-application for summary relief.[22] Revenue's cross-application for summary relief is denied.

_____
ELLEN CEISLER, Judge

---

[22] In light of our disposition of the Guild's due process claim, we need not address its remaining arguments.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Online Merchants Guild,      :
                 Petitioner   :
                              :
        v.                    : No. 179 M.D. 2021
                              :
C. Daniel Hassell, in his official :
capacity as Secretary of Revenue, :
Department of Revenue,        :
                 Respondent   :

# **O R D E R**

AND NOW, this 9th day of September, 2022, the cross-application for summary relief filed by the Online Merchants Guild is hereby GRANTED.  The cross-application for summary relief filed by C. Daniel Hassell is DENIED.

_____
ELLEN CEISLER, Judge